ALBERT W. BASSETT and MARY H. BASSETT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bassett v. Commissioner
Docket No. 8166-73.
United States Tax Court
T.C. Memo 1976-14; 1976 Tax Ct. Memo LEXIS 389; 35 T.C.M. (CCH) 40; T.C.M. (RIA) 760014; January 20, 1976, Filed Jack W. Hawkins and Suzan E. Riddle, for the petitioners. Douglas R. Fortney, for the respondent. FAY
MEMORANDUM FINDINGS OF FACT AND OPINION FAY, Judge: Respondent determined deficiencies in petitioners' Federal income taxes of $280.72 and *390 $10,701.61 for the years 1969 and 1970, respectively. Concessions having been made, it remains for us to decide: (1) Whether construction by petitioners of certain residential property was an activity engaged in for profit so as to entitle them to a deduction for a loss incurred on the sale of the property; and (2) whether petitioners are entitled to deduct amounts expended to insure and maintain the property during the years in issue. FINDINGS OF FACT The petitioners Albert W. (Albert) and Mary H. (Mary) Bassett, husband and wife, were residents of Pampa, Texas, when their petition was filed with this Court. They filed joint Federal income tax returns for 1969 and 1970 with the District Director of Internal Revenue, Dallas, Texas. At all times relevant, Albert was employed as publisher by Freedom Newspapers, Inc., a corporation which owned newspapers published in various cities throughout the country. Prior to 1969, Albert's post of employment was in Orange County, California. In July 1966, petitioners purchased a lot in Orange County for $17,500. In April 1968, they engaged the services of an architect to design and supervise construction of a personal residence on the *391 lot. The architect's fee was to be $3,500. Petitioners entered a construction agreement with a builder in October 1968 for a contract price of $76,100. Construction of the house began immediately but heavy rains in the winter of 1968 drastically impeded progress; by February 1969 only the foundation slab had been poured. Due to the magnitude of the project, construction of the new house caused such disharmony in petitioners' marital relationship that Albert departed from the home where they were then residing. During Albert's twelve-day absence, Mary ordered that construction of the new house be halted. Petitioners reconciled their differences following Albert's return home, but since it was the construction of the large new house that originally caused discord, they agreed it would be best to abandon plans to construct the house as their personal residence. At the time work ceased, petitioners had expended a total of $29,678.33 on the house, $17,500.00 representing the cost of the lot and the remaining $12,178.33 representing various amounts paid to the architects, appraisers, banks, and contractors. The fair market value of the lot, as improved, was at least equal to the *392 amount petitioners had expended. After conferring with his architect and builder Albert decided on March 7, 1969, to go forward with the construction of the home with the idea of eventually selling it for a profit. By eliminating certain custom features of the house, it was estimated that costs could be reduced as much as $10,000, thereby allowing for a substantial profit margin. The total cost of the completed house then contemplated would have been $87,200, comprised of $17,600 in land cost, $3,500 in architectural fees, and $66,100 in construction costs. Albert contemplated a $99,600 selling price for the house which, after deducting real estate commissions, would have yielded to him a profit of $6,500. On June 2, 1969, Albert ordered several modifications in the original design of the house in order to reduce the construction cost and, at the same time, give the house a broader appeal in the commercial real estate market. With the house well under construction, however, all of the changes originally anticipated could not be implemented. The resulting cost reduction was only $4,629, instead of the $10,000 reduction earlier projected by the builder and architect. In May *393 1969, Albert was transferred by his employer to Pampa, Texas, where he became publisher of a daily newspaper. Before he departed Orange County, Albert entered into a sales arrangement with an individual real estate agent who resided near the house. The asking price for the house was $99,750. Dissatisfied with the individual agent's efforts to sell the house, Albert terminated the arrangement and, on January 11, 1970, listed the house for sale with a large commercial real estate firm and reduced the asking price to $92,500. Extensive efforts to sell the house by advertisement and public showing met with little success. On March 23, 1970, Albert's realtors informed him that, in their opinion, the difficulty in selling the house was characteristic of the general downward economic trend then prevalent in Orange County. In fact, during the period from March 1969 through late 1970, economic conditions in Orange County, California, declined dramatically. Available mortgage funds were scarce; interest rates climbed steadily from 7 percent in 1968 to 9-3/4 percent in 1970. The aerospace industry, on which Orange County was greatly dependent, experienced severe setbacks. In March 1970 *394 the unemployment rate in Orange County rose to 5.4 percent; by June it had reached 7.1 percent. These deteriorating conditions had not yet begun at the time Albert made his decision to follow through with construction of the house, and decided upon his initial asking price. Prior to 1969, Orange County had enjoyed unprecedented prosperity. In an attempt to rent the house in April 1970, escrow proceedings were begun in anticipation of a proposed lease option agreement. The arrangement, however, was frustrated when the prospective purchaser withdrew. The house was finally sold on June 1, 1970, for a gross sales price of $80,000. Petitioners' basis in the completed house was $93,766.97. In addition, expenses of $5,401.50 were incurred in connection with the sale of the house along with various maintenance expenses not included in the basis of the house. On their joint Federal income tax returns for 1970 petitioners claimed deductions of $13,766.97 for the loss incurred on the sale of the property and $5,593.50 for amounts expended to insure, maintain, and sell the property. An insurance deduction of $364 was also claimed on their 1969 return. These deductions were disallowed and *395 a deficiency determined in a statutory notice mailed August 16, 1973. OPINION The issue to be decided is whether the residential property was held for the production of income within the meaning of section 212 [1] so as to entitle petitioners to the loss sustained on the sale of the property. Respondent contends that the property was never converted from personal use and that, consequently, the incurred loss is not deductible. Petitioners' burden is to show that the property, initially purchased for personal reasons, was at some point appropriated to an income-producing purpose. Income Tax Regs. § 1.165-9(b)(1); [2]Heiner v. Tindle,276 U.S. 582 (1928); and Edward L. Parker,19 B.T.A. 171 (1930). If this burden is to be sustained, the record must clearly evince a change in *396 attitude and intention toward the property. Heiner v. Tindle,supra.We feel that petitioners have sufficiently demonstrated such a departure. Albert and Mary acquired land and commenced construction of a personal dwelling in late 1968. In 1969, with construction barely under way, they decided not to occupy the house and ordered the work ceased. Albert then was confronted with a choice regarding the property--he could sell the land for fair market value in its improved condition and thereby recover his expenditures; or he could continue construction with the intention of deriving a profit from the sale of the improved property. Albert decided on the latter course and, endeavoring to maximize potential profits, increased substantially his investment in *397 the property. Albert was then transferred and moved his family from California to Texas, never having occupied the house at any time. [3]
*398 Although the initial acquisition was personal, we are convinced that a conversion did occur and that construction of the dwelling was completed primarily as an investment. Helen Converse Thorpe,3 B.T.A. 1006 (1926); Sidney W. Sinsheimer,7 B.T.A. 1099 (1927); John N. Hughes,8 B.T.A. 206 (1927); Henry J. Gordon,12 B.T.A. 1191 (1928); W. W. Holloway, Administrator,19 B.T.A. 378 (1930); Marjorie G. Randall,27 B.T.A. 475 (1932); Westmore Willcox,20 T.C. 305 (1953); Cf. Harold K. Meyer,34 T.C. 528 (1960); and James E. Austin,35 T.C. 221 (1960), affd. 298 F.2d 583 (C.A. 2, 1962). The evidence reveals that from the moment of his decision not to occupy but, nevertheless, to move forward with construction of the house, Albert treated the property not as his home but as a piece of property from which he expected to derive some financial benefit. Indeed his only reason for completing the structure was in furtherance of his intention to realize a profit. The conversion is further evidenced by Albert's alterations *399 in the design of the house which ultimately changed the nature of the property to that better suited to the commercial homebuyers' market. See Marjorie G. Randall,supra.
The fact that Albert's expectations were frustrated by unforeseen decay of economic conditions does not alter the nature of the venture as one undertaken with a reasonable expectation of a profit. We therefore hold that petitioners' loss was incurred in a transaction entered into for profit within the meaning of section 165(c)(2). [4]Sidney W. Sinsheimer,supra.
Having held that there existed such a transaction subsequent to February 1969, the expenditures incurred in insuring and maintaining the property were properly deducted. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended. SEC 212. EXPENSES FOR PRODUCTION OF INCOME. In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year-- (1) for the production or collection of income; * * *↩
2. Sec. 1.165-9(b)(1) provides: Property converted from personal use. (1) if property purchased or constructed by the taxpayer for use as his personal residence is, prior to its sale, rented or otherwise appropriated to income-producing purposes and is used for such purposes up to the time of its sale, a loss sustained on the sale of the property shall be allowed as a deduction under section 165(a).↩
3. Most of the decided residential "conversion" cases involve factual situations in which the taxpayer actually occupied the dwelling. See e.g., Helen Converse Thorpe,3 B.T.A. 1006 (1926); Sidney W. Sinsheimer,7 B.T.A. 1099 (1927); John N. Hughes,8 B.T.A. 206 (1927); Henry J. Gordon,12 B.T.A. 1191 (1928); W. W. Holloway, Administrator,19 B.T.A. 378 (1930); Marjorie G. Randall,27 B.T.A. 475 (1932); Richard P. Koehn,16 T.C. 1378 (1951); Gilbert Wilkes,17 T.C. 865 (1951); Westmore Willcox,20 T.C. 305 (1953); Harold K. Meyer,34 T.C. 528 (1960); James E. Austin,35 T.C. 221 (1960), affd. 298 F.2d 583 (C.A. 2 1962). We have noted that the presence of this element tends to bestow personal overtones on any expense or loss incurred. See Charles F. Neave,17 T.C. 1237 (1952); Warren Leslie, Sr.,6 T.C. 488 (1946). Consequently, we regard the total absence of occupancy in this case as a factor weighing heavily in petitioners' favor. See Frank A. Newcombe,54 T.C. 1298, 1300 (1970). See also Income Tax Regs. § 1.165-9(a) which disallows losses "sustained on the sale of residential property purchased or constructed by the taxpayer for use as his personal residence and so used↩ by him up to the time of the sale * * *". (Emphasis supplied).
4. SEC. 165. LOSSES. (c) Limitation on Losses of Individuals.--In the case of an individual, the deduction under subsection (a) shall be limited to-- * * *
(2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; * * *↩